

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 20, 2024.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-51417-CAG |
| | § | |
| ALPHONSE TORIBIO, JR. and | § | CHAPTER 7 |
| LUPITA TORIBIO, | § | |
| Debtors. | § | |

---

| | | |
|---|---|---|
| J.A.S. FARMS, INC., AN ILLINOIS | § | |
| CORPORATION, | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 23-05034- CAG |
| v. | § | |
| | § | |
| LUPITA TORIBIO | § | |
| Defendant. | § | |

### MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND OBJECTION TO DISCHARGE

This Memorandum Opinion resolves the above-styled adversary proceeding filed by

Plaintiff: (i) objecting to the dischargeability of its claims against Debtor-Defendant pursuant to

11 U.S.C. § 523(a)(2) and (a)(6); (ii) objecting to Debtor's discharge pursuant to 11 U.S.C.

§ 727(a)(4); and (iii) seeking to liquidate its claim for tortious interference with an existing contract.

Beginning on March 26, 2024, this Court conducted a three-day trial before taking the matter under advisement. Thereafter, the Court reviewed the entire record before it, including all admitted exhibits. The Court also considered the testimony and credibility of all witnesses. Additionally, the Court considered all evidentiary objections raised and sustained in making its findings of fact. For the reasons stated herein, the Court finds that Defendant's debt to Plaintiff is dischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(6),[1] and Defendant will not receive her Chapter 7 discharge under § 727(a)(4).

## JURISDICTION

As an initial matter, the parties have stipulated to, and the Court finds, it has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 (ECF Nos. 1, 5, and 28);[2] *see also Wellness Int'l Network, Ltd. v. Sharif (In re Sharif)*, 575 U.S. 665, 684 (2015) (finding bankruptcy courts have constitutional authority to enter a final order when the parties consent). This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(I) and (J). The Court finds that venue is proper under 28 U.S.C. § 1409(a). This matter is referred to the Court pursuant to the District Court's Standing Order of Reference. Both parties have consented to the entry of a final order or judgment by this Court (ECF Nos. 9, 10, and 28-2 at 2). The Court makes its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

On December 12, 2022 (the "Petition Date"), Alphonse Toribio, Jr. ("Co-Debtor"), and Lupita Toribio ("Debtor" or "Defendant") filed a voluntary Chapter 7 petition for relief with their

---

[1] Unless otherwise noted, all references are to Title 11, U.S.C. *et seq.*
[2] Unless otherwise noted, all references to "ECF" refer to documents filed in Adversary Proceeding 23-05034.

initial Schedules ("Initial Schedules") and Statement of Financial Affairs ("Initial SOFA") commencing Bankruptcy Case No. 22-51417 (the "Bankruptcy Case" or "Main Case") (Main Case ECF No. 1). Defendant attended the January 12, 2023 meeting of creditors with counsel. The Chapter 7 Trustee adjourned the meeting of creditors to January 24, 2023. The January 24, 2023 meeting of creditors was continued to February 16, 2023. Defendant filed her Second Amended SOFA on February 16, 2023 (Main Case ECF No. 14). The February 16, 2023 meeting of creditors was continued to February 24, 2023. On March 8, 2023, Defendant filed the Second and Third Amended Schedules and the Third Amended SOFA (Main Case ECF No. 22). The February 24, 2023 meeting of creditors was continued to March 9, 2023. In all instances, before filing any Amended SOFAs, Defendant signed the Statement declaring under penalty of perjury that she had read the answers to the questions therein and that they were true and correct.

J.A.S. Farms, Inc. ("Plaintiff") (i) objects to the dischargeability of its claims against Debtor pursuant to 11 U.S.C. § 523(a)(2) and (a)(6); (ii) objects to Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4); and (iii) seeks to liquidate its claim for tortious interference with an existing contract.

Defendant Lupita Toribio once resided at 3607 East Avenue, Berwyn, Illinois 60402 (the "Berwyn Residence") with her husband and Co-Debtor, Alphonse Toribio, Jr. (ECF No. 28 at 3). Defendant inherited real property located at 13660 N. 3400 East Road, Chatsworth, Illinois 60921 (the "Chatsworth Residence"). Currently, Defendant resides on real property located at 7651 Champion Creek, San Antonio, Texas 78252 (the "San Antonio Residence") (ECF No. 28-2 at 24).

Plaintiff J.A.S. Farms, Inc. is an individual creditor of Debtor in her Chapter 7 bankruptcy. Plaintiff is a corporation with its principal place of business in Chatsworth, Illinois (ECF No. 28-

2 at 1). Plaintiff primarily engages in agricultural operations in central Illinois (ECF No. 28 at 2). Casey Sterrenberg, Plaintiff's Chief Operating Officer and corporate representative, is a lifelong resident and farmer in Chatsworth. Plaintiff owns several hundred acres of farmland in Chatsworth and its surrounding areas. Defendant's Chatsworth Residence was within a quarter-mile radius, or about 330 feet, of Plaintiff's proposed construction site for the livestock operation (the "Swine Facility") (ECF No. 28 at 3).

## The Parties' Contentions

In summary, Plaintiff alleges that when Defendant made representations of fact to the Illinois Department of Agriculture (the "Department of Agriculture"), she engaged in fraudulent conduct pursuant to § 523(a)(2)(A). Plaintiff alleges that Defendant made these false representations and statements, in writing, with the intent of deceiving Plaintiff and the Department of Agriculture. Additionally, Plaintiff alleges that Defendant was aware that halting the Swine Facility project, which the Department of Agriculture had previously approved, would benefit her. Plaintiff alleges that the Department of Agriculture justifiably relied on Defendant's false representations, resulting in a stay of construction for the Swine Facility. As a direct and proximate result of the Department of Agriculture's reliance, Plaintiff suffered damages.

Second, Plaintiff alleges that when Defendant made representations to the Department of Agriculture, she acted with objective substantial certainty of harm or a subjective motive to cause harm to Plaintiff pursuant to § 523(a)(6). Plaintiff therefore alleges that Defendant caused a willful and malicious injury to Plaintiff. Additionally, Plaintiff alleges that Defendant took actions that she knew would delay state court lawsuit proceedings and further increase Plaintiff's damages. Plaintiff further alleges that Defendant acted with objective substantial certainty of harm or a

subjective motive to cause harm to Plaintiff. For these reasons, Plaintiff alleges that the debt is non dischargeable because Defendant caused willful and malicious injury to Plaintiff.

Third, Plaintiff alleges that Defendant knowingly and fraudulently made false oaths in the Main Bankruptcy Case pursuant to § 727(a)(4).

Lastly, Plaintiff alleges that it had a valid contract with Farm Boy Ag, Inc. ("Farm Boy") for the construction of the Swine Facility. Plaintiff argues that Defendant willfully and intentionally interfered with Plaintiff's contract with Farm Boy by making false claims, which caused the Department of Agriculture to issue a stay of construction to Plaintiff on a project that the Department had previously approved. Plaintiff contends that its injury resulted from Defendant's malice or actual fraud, which entitles it to exemplary damages under Texas Civil Practice and Remedies Code § 41.003(a).

In response, Defendant denies Plaintiff's allegations. Defendant alleged that any errors or omissions in her Petition, Schedules, or Statements were inadvertent. Further, Defendant asserts that the alleged errors or omissions were immaterial. Defendant maintains that she had no intent to defraud.

### FINDINGS OF FACT

#### I.    Stipulated Facts

On January 29, 2024, the Parties submitted a Joint Pretrial Order with their statement of stipulated facts, which the Court now adopts (ECF No. 28).

## II.     Findings of Fact (Summary of the Oral Testimony)

### Casey Sterrenberg

The Court found Casey Sterrenberg to be a credible witness. Casey Sterrenberg, Plaintiff's Chief Operating Officer and corporate representative, is a lifelong resident and farmer in Chatsworth, Illinois.

Sterrenberg testified that in 2020, Plaintiff commenced the application process for the construction of a Swine Facility (ECF No. 28 at 2). This involved, with the assistance of Frank & West Environmental Engineers, Inc. (the "Environmental Engineers"), submitting a Notice of Intent to Construct (the "NOITC") to the Department of Agriculture (ECF No. 28 at 2). Sterrenberg explained that the NOITC sets forth a setback requirement,[3] which required Plaintiff to identify any structure that may be an "occupied residence"[4] and provide notice to any such potential "occupied resident." In other words, Plaintiff was first required to provide the names and addresses of real property owners "located within the setback area." (Plf. Trial Ex. 1, at 6). Plaintiff was subsequently "required to mail by certified mail, return receipt required, a copy of the complete notice of intent to construct to the owners of the property located within the setback areas." (Plf. Trial Ex. 1, at 9).

---

[3] Section 35 of the Livestock Management Facilities Act (510 ILCS 77/35) titled "Setbacks for livestock management and livestock handling facilities[]" provides in relevant part:
> (c) New livestock management or livestock waste handling facilities. Any new facility shall comply with the following setbacks:
> . . .
> (3) For a livestock management facility or waste handling facility serving 50 or greater but less than 1,000 animal units, the minimum setback distance shall be ¼ mile from the nearest occupied residence and ½ mile from the nearest populated area.

[4] 8 Illinois Administrative Code 900 defines "occupied residence" to mean:
> [A] house or other type of shelter that is intended or used for human occupancy and has been occupied by humans for more than a total of six months in the last two years at that location. For the purposes of this definition, "intended or used for human occupancy" means running water and sanitation are provided within the residence.

Sterrenberg testified that Plaintiff engaged the services of the Environmental Engineers, specifically Jacob "Jake" Nims, to manage the paperwork for the NOITC and to ensure the proper mailing of notices. Plaintiff alleges that on January 27, 2021,[5] through certified mail, the NOITC was delivered to all residences listed, including Defendant, of its intent to construct the Swine Facility (ECF No. 28 at 3, Plf. Trial Ex. 8, and Plf. Trial Ex. 1 at 7). According to Plaintiff, Jake Nims mailed the NOITC[6] to Defendant's Berwyn Residence, as this was the address listed on her property taxes and was her residence at the time (ECF No. 28 at 3, Plf. Trial Ex. 1 at 7, and Plf. Trial Ex. 70 at 742–44). Plaintiff contends that the NOITC mailed to Defendant's Berwyn Residence was forwarded to her San Antonio Residence (Plf. Trial Ex. 63 at 94). Plaintiff further asserts that the NOITC was subsequently returned to Jake Nims's office in Springfield, Illinois (Plf. Trial Ex. 63 at 94 and Plf. Trial Ex. 8).

After Plaintiff submitted its NOITC to the Department of Agriculture and provided the required notices to residents, but before receiving the Department's written authorization to construct letter ("Authorization to Construct"), Plaintiff entered the following contracts for its Swine Facility:

(i)    a building contract executed February 26, 2021 with Farm Boy Ag, Inc. ("Farm Boy") for construction of the Swine Facility with a contract price of $736,690.

(ii)   a wean to finish agreement executed March 6, 2021 with Special K Hog Farm to finish weaning hogs as part of Special K Hog's swine operation.

(ECF No. 28 at 3, Plf. Trial Ex. 4, and Plf. Trial Ex. 6).

The Department of Agriculture issued its written Authorization to Construct on March 12, 2021 (ECF No. 28 at 3, Plf. Trial Ex. 66, and Plf. Trial Ex. 67). In its paperwork to the Department

---

[5] To clarify, the Joint Pretrial Order provides that Plaintiff mailed the NOITC letters on February 8, 2021 (ECF No. 28 at 3), however, there Plaintiff references Exhibit B of the Complaint for support. Both Exhibit B of the Complaint and Plaintiff's Trial Exhibits 8 and 70 at 743–44 indicate an alleged mailing date of January 27, 2021.

[6] Plf. Trial Ex. 70 provides eleven certified mail receipts of Plaintiff's alleged NOITC letter. Among the alleged eleven NOITC letters sent, Defendant is the only resident who claims not to have received it.

of Agriculture, Plaintiff included a map depicting residences within a quarter-mile radius and half-mile radius of the proposed Swine Facility (Plf. Trial Ex. 1 at 10). Defendant's residence, situated within a quarter-mile of the proposed facility, was labeled an "abandoned residence" rather than an "occupied residence" as defined by the Livestock Management Facility Regulations. Ill. Adm. Code 900 (ECF No. 28 at 3 and Plf. Trial Ex. 1 at 10). Because Defendant's residence was classified as "abandoned" and therefore not an "occupied residence," the Department of Agriculture authorized construction of the Swine Facility and determined that Plaintiff satisfied the setback requirements pursuant to 510 ILCS 77/35(c) (ECF No. 28 at 3).

**Defendant Lupita Toribio**

The Court finds Defendant's testimony to be inconsistent and evasive. Further, Defendant's answers were at times non-responsive to the questions asked. On multiple occasions, the Court instructed Defendant to answer questions and to avoid arguing with counsel. The Court finds that it should give limited credibility to Defendant's testimony.

Notwithstanding the evidence presented by Plaintiff, Defendant maintains that she did not receive a certified mail copy of Plaintiff's NOITC the Swine Facility (ECF No. 28 at 12). Although Defendant's Initial SOFA provides that she and the Co-Debtor lived at the Berwyn Residence from 1989 to October 2019 (Plf. Ex. 31 at 118), Defendant testified that she and the Co-Debtor[7] resided at the Berwyn Residence from 1993 to October 2019 (ECF No. 35 at 170). Sometime in December 2019, Defendant moved to the San Antonio Residence and has since claimed a homestead exemption[8] on that property (ECF No. 35 at 161–62).

---

[7] The Court chose not to summarize the testimony of the Co-Debtor, Alphonse Toribio, as it is entirely consistent with Defendant's testimony.

[8] The evidence presented to the Court demonstrated a questionable homestead exemption practice, including Defendant claiming a homestead on the Chatsworth Residence, despite testifying that she lived with the Co-Debtor at the Berwyn Residence (ECF No. 35 at 187–95). Defendant testified that she visited the Chatsworth Residence "often." (ECF No 35 at 193). Defendant acknowledged that she can only claim one homestead exemption at a time (ECF No. 35 at 194–95). The evidence regarding Defendant's claimed homestead exemption was uncontroverted.

Sometime in April 2021, approximately 16 months after relocating to San Antonio, Defendant allegedly learned from either her cousin or a neighbor in Chatsworth of the Swine Facility's proposed construction (ECF No. 35 at 217). Defendant first contacted the Department of Agriculture, specifically Rosario Johnstone, [9] to inquire about the Swine Facility (ECF No. 35 at 213). Despite Defendant living at the San Antonio Residence at the time, Defendant represented to Johnstone that (i) she never received notice of the NOITC and (ii) that she was currently living at the Chatsworth Residence (ECF No. 35 at 207). Defendant testified that the purpose of contacting Johnstone was to explain to her that the Chatsworth Residence was her property and to gather information regarding the Swine Facility (ECF No. 35 at 207, 213). As a result of Defendant's representation to Johnstone that she currently resided at the Chatsworth Residence, on April 14, 2021, Johnstone instructed Jake Nims to halt the construction of the Swine Facility because Defendant's residence was no longer deemed "abandoned" (Plf. Trial Ex. 65 at 41). The stay of construction came about one month after Plaintiff received the Department of Agriculture's Authorization to Construct.

At trial, Defendant testified that perhaps she "worded it wrong" when she represented to Johnstone that she currently lived at the Chatsworth Residence, when in reality, she lived at the San Antonio Residence (ECF No. 35 at 207). Defendant further clarified that she meant to say that the Chatsworth Residence was her property, instead of stating that she presently lived there (ECF No. 35 at 207).

On April 26, 2021, Defendant sent the Department of Agriculture a handwritten letter alleging that her Chatsworth Residence, which was situated within a quarter-mile of the proposed Swine Facility, was not an "abandoned property" because she presently lived there (ECF No. 28

---

[9] At the time, Rosario Johnstone was the Manager of the Technical Services & Pesticide Laboratory division of the Illinois Department of Agriculture.

at 12 and Plf. Trial Ex. 2 at 42–43). Attached to the letter was the most recent electricity bill for the Chatsworth Residence (Plf. Trial Ex. 2 at 44–45). The electricity bill[10] for the Chatsworth Residence listed Defendant's San Antonio Residence as the mailing address (Plf. Trial Ex. 2 at 44). At trial, Defendant agreed with the statement that mail and utility bills should be delivered to one's current residence to ensure proper receipt (ECF No. 35 at 212).

On May 5, 2021, Defendant wrote the Department of Agriculture a second letter alleging that the Chatsworth Residence was her "country home," that the Chatsworth Residence has never been abandoned, and that she opposed the construction of the Swine Facility (Plf. Trial Ex. 3 at 418–19). Defendant further wrote that she has paid the cable bill on the Chatsworth Residence for over 35 years (Plf. Trial Ex. 3 at 417).

### Affidavit of Kelly Diller

Kelly Diller has been a U.S. Mail Carrier for 27 years in the Chatsworth, Illinois community and surrounding areas (Plf. Trial Ex. 63 at 51). In her Affidavit dated April 23, 2021, Diller asserts that she is familiar with the Chatsworth Residence, having delivered mail there for several years (Plf. Trial Ex. 63 at 51). Diller explains that she eventually stopped delivery to the Chatsworth Residence because there was no mail to be delivered (Plf. Trial Ex. 63 at 51). She believed that no one resided at the Chatsworth Residence (Plf. Trial Ex. 63 at 51). Diller estimated that she ceased delivering mail to the Chatsworth Residence sometime in 2015 and that delivery has not resumed since (Plf. Trial Ex. 63 at 51). In Diller's experience, non-delivery to a residential address indicates that the location has been unoccupied for many years (Plf. Trial Ex. 63 at 51).

---

[10] The evidence was uncontroverted that Defendant had an unusually low kilowatt hour usage on her Chatsworth Residence utility bill, despite claiming that she lived there. The Court found Casey Sterrenberg's testimony credible that, per his experience, Defendant's electricity usage was well below average for an occupied property in the area (ECF No. 35 at 72–73).

Defendant does not dispute that Kelly Diller is U.S. Mail Carrier in Chatsworth, Illinois. Defendant testified that she did not receive mail at the Chatsworth Residence because sometime in 2019 she elected to have mail delivered to a P.O. Box in Berwyn, Illinois near the Berwyn Residence.

### A. The State Court Lawsuit

Plaintiff filed its petition for relief in Livingston County, Illinois (the "State Court Lawsuit") on May 18, 2021 (Plf. Trial Ex. 45). Sterrenberg testified that the purpose of the State Court Lawsuit was for a court to determine whether Defendant's Chatsworth Residence was "occupied" in accordance with 8 Illinois Administrative Code 900.103 (ECF No. 35 at 79).

In her answer, which was signed under oath, Defendant denied Plaintiff's allegations and argued that she occupied the Chatsworth Residence as her primary residence from April 2019 to October 2019 (Plf. Trial Ex. 46 at 977, 980 and Plf. Trial Ex. 26). In her affidavit, which was also signed under oath, Defendant stated that she used the Chatsworth Residence as her primary residence continuously from April 2019 to October 2019 (Plf. Trial Ex. 26). Defendant withdrew her answer and failed to respond to Plaintiff's Motion for default judgment (Plf. Trial Ex. 56). Soon after the State Court Lawsuit was initiated, Defendant sold the Chatsworth Residence for $50,000 to her cousin, Pablo Mauricio, on June 29, 2021 (Plf. Trial Ex. 25).

A default order was entered against Defendant on February 17, 2022 (Plf. Trial Ex. 57). There, the state court found that for all relevant time periods, including January 22, 2019 to January 22, 2021 (the "Setback Period"), Plaintiff remained in compliance with the setback requirements of the Livestock Management Facilities Act (Plf. Trial Ex. 57). The state court also determined that the Chatsworth Residence was not an "occupied residence" pursuant to ILCS 77/35 or under 8 Illinois Administrative Code 900 (Plf. Trial Ex. 57). Further, the state court found that neither

Defendant nor any members of her family occupied the Chatsworth Residence for a period of six months during the Setback Period (Plf. Trial Ex. 57). According to the state court, the Chatsworth Residence was not intended or used for human occupancy (Plf. Trial Ex. 57).

### B. Construction of the Swine Facility

Approximately 10 months after the Department of Agriculture issued a stay of construction on the Swine Facility, Defendant's then-counsel informed Plaintiff that construction could resume given the state court's default order (Plf. Trial Ex. 64 at 37). As a result of the COVID-19 pandemic, construction material costs increased significantly during this time. Construction of the Swine Facility was completed in October 2022 at the originally anticipated location in Chatsworth, Illinois.

According to Plaintiff, the 10-month delay caused by the State Court Lawsuit resulted in the following additional increased expenses, all of which Plaintiff agreed to pay:

(i)    The interest rate[11] on Plaintiff's commercial agricultural promissory note with State Bank of Graymont increased from 2.95% to 4.25% (Plf. Trial Ex. 84).
(ii)   Plaintiff's quote for the construction of the Swine Facility increased by $3,248.68 (Plf. Trial Ex. 85).
(iii)  Plaintiff's estimated plumbing quote increased by 20% (Plf. Trial Ex. 86).
(iv)   Plaintiff's total contract price with Farm Boy increased from $736,690 to $932,700 (Plf. Trial Ex. 4 and Plf. Trial Ex. 5).
(v)    Plaintiff's excavation operation costs increased by 10% (Plf. Trial Ex. 87).
(vi)   Plaintiff also argues that included in its damages are lost profits related to the Special K Hog Farm contract.

### C. Defendant's Schedules, Statement of Financial Affairs, and Testimony at the Meetings of Creditors

On the Petition Date, Defendant filed her Schedules and Initial SOFA (Main Case ECF No. 1). Jose C. Rodriguez was appointed interim Chapter 7 trustee (the "Chapter 7 Trustee"). On

---

[11] As part of Plaintiff's damages, Plaintiff requests that the Court award the difference between the 2.95% interest rate at a 5-year fixed rate versus the 4.25% interest rate at a 5-year fixed rate on Plaintiff's $1,000,000 promissory note (Plf. Trial Ex. 37).

Question 18 of the SOFA, Defendant was asked: "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" (Main Case ECF No. 1 at 60). Defendant answered "No" to this question. Defendant signed the signature page accompanying the SOFA, acknowledging that she had read the answers and declared under penalty of perjury that the answers on the SOFA and in any attachments were true and correct (Main Case ECF No. 1 at 65).

At the January 12, 2023 meeting of creditors (the "First Creditor Meeting"), Defendant was asked whether she had an opportunity to read the bankruptcy schedules and statements that were prepared on her behalf (Plf. Trial Ex. 82, Part 1 at 2). [12] Defendant answered affirmatively (Plf. Trial Ex. 82, Part 1 at 2). Plaintiff's counsel asked Defendant whether SOFA Question 18 was correct, specifically that Defendant had not sold property to anyone within two years of filing for bankruptcy (Plf. Trial Ex. 82, Part 1 at 3). Defendant stated, "It's correct." (Plf. Trial Ex. 82, Part 1 at 3). Defendant subsequently explained that she owned the Chatsworth Residence, and that she sold it sometime in June 2021 or July 2021 to her cousin, Pablo Mauricio, for $50,000 (Plf. Trial Ex. 82, Part 1 at 3). Plaintiff's counsel then asked Defendant why she failed to list under SOFA Question 18 the sale of the Chatsworth Residence that occurred within two years of the bankruptcy filing (Plf. Trial Ex. 82, Part 1 at 3). Defendant repeatedly answered that she currently was "not looking at the [SOFA] paperwork," that she did not have the [SOFA] paperwork in front of her, and that it "must have been a mistake." (Plf. Trial Ex. 82, Part 1 at 3–4). The First Creditor Meeting was continued to January 24, 2023, in part, so that Defendant could correct the inaccurate statements (Plf. Trial Ex. 82, Part 1 at 5).

---

[12] Plf. Trial Ex. 82 is divided into five sections, in accordance with Defendant's five creditor meetings. References to Plf. Trial Ex. 82 will therefore specifically refer to Parts 1 through 5.

The January 24, 2023 meeting of creditors (the "Second Creditor Meeting") was continued to February 16, 2023 to allow Defendant additional time to file her amended SOFA (Plf. Trial Ex. 82, Part 2 at 3). Defendant filed her First Amended SOFA on the morning of February 16, 2023, (Main Case ECF No. 14). At the February 16, 2023 meeting of creditors (the "Third Creditor Meeting"), Defendant's counsel and the Chapter 7 Trustee each repeatedly asked Defendant to explain how the proceeds from the sale of the Chatsworth Residence were spent (Plf. Trial Ex. 82, Part 3 at 2). Finally, Defendant disclosed that she gave approximately $18,000 to seven family members, stating that these funds came from the proceeds of the sale of the Chatsworth Residence (Plf. Trial Ex. 82, Part 3 at 3–5). The Third Creditor Meeting was continued to February 24, 2023 to allow Defendant additional time to amend her First Amended SOFA (Plf. Trial Ex. 82, Part 3 at 6).

In the First Amended SOFA, Defendant listed the sale of the Chatsworth Residence, stating that it was sold to an individual named Pablo Mauricio on July 2, 2021, for $49,236.94 (Main Case ECF No. 14 at 8). Part of SOFA Question 18 requires a debtor to provide the relationship of the transferee of any such transfer made within two years of the filing of the Petition (Main Case ECF No. 14 at 8). For this question, Defendant stated "None," signifying no relationship between her and the transferee, despite the transferee being Defendant's cousin. Notably, Defendant answered "No" under SOFA Question 13, which asks: "Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?" (Main Case ECF No. 14 at 5). Defendant signed the signature page accompanying the First Amended SOFA, acknowledging that she read the answers and declared under penalty of perjury that the answers on this SOFA and in any attachments were true and correct. (Main Case ECF No. 14 at 12).

At the February 24, 2023 meeting of creditors (the "Fourth Creditor Meeting"), Plaintiff's counsel again asked Defendant questions and it was determined, as before, that the First Amended SOFA also contained inaccurate information. Defendant failed to disclose on the First Amended SOFA that the buyer of the Chatsworth Residence was Defendant's cousin (Plf. Trial Ex. 82, Part 4 at 4). It was further determined that Defendant failed to list several cash gifts to various family members in response to SOFA Question 13 on both the Initial and First Amended SOFA (Plf. Trial Ex. 82, Part 4 at 3–4). The Chapter 7 Trustee adjourned the Fourth Creditor Meeting to March 9, 2023 to allow Defendant additional time to amend the First Amended SOFA (Plf. Trial Ex. 82, Part 4 at 5).

On March 8, 2023, the day before the March 9, 2023 meeting of creditors (the "Fifth Creditor Meeting"), Defendant filed the Second Amended SOFA (Main Case ECF No. 14). There, Defendant stated that the Chatsworth Residence was sold to her cousin, Pablo Mauricio (Main Case ECF No. 22 at 10). Regarding SOFA Question 13, Defendant identified cash gifts totaling $20,000 given within two years of the Petition Date (Main Case ECF No. 22 at 5). These gifts were made to nine different individuals, all of whom are related to Defendant, including: various siblings, her daughter, and one individual for whom the relationship was not stated (Main Case ECF No. 22 at 6–8). Before filing the Second Amended SOFA, Defendant signed the signature page declaring "under penalty of perjury that the information on this statement and in any attachments is true and correct." (Main Case ECF No. 22 at 15). The Chapter 7 Trustee concluded the Fifth Creditor Meeting and filed a no-asset report. Plaintiff's counsel appeared at this meeting but was advised by the Chapter 7 Trustee that further questions for Defendant would need to be obtained through a 2004 Examination (Plf. Trial Ex. 82, Part 5 at 3).

At trial, Defendant was asked why she failed, on three separate occasions, to list the sale of the Chatsworth Residence on her statements (ECF No. 35 at 189). Defendant testified that "all three times, it was just an oversight." (ECF No. 35 at 189). At trial, Defendant was asked whether she reviewed the answers she provided in the Initial SOFA before signing it (ECF No. 35 at 175). Defendant explained that she did not remember and that there "were a lot of questions." (ECF No. 35 at 175). Defendant answered similarly when asked whether she reviewed the First Amended SOFA (ECF No. 35 at 176). When asked about her Second Amended SOFA, Defendant testified that she would not have intentionally lied on the bankruptcy papers (ECF No. 35 at 178).

<b>A<small>NALYSIS</small></b>

**I. Non-Dischargeability Under 11 U.S.C. § 727(a)(4)(A)—Undisclosed Income from the Chatsworth Residence Sale; Transfers to Family Members; and Undisclosed Assets.**

Section 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account . . . ." 11 U.S.C. § 727(a)(4) (West 2020). Here, Plaintiff alleges that Defendant made numerous omissions and false statements under penalty of perjury, including:

(i) Plaintiff asserts that Defendant's failure to disclose the sale of the Chatsworth Residence, under Question 18 of the Initial SOFA, is a false oath. Defendant asserts that this omission was a mistake and oversight.

(ii) Plaintiff asserts that Defendant's omission of her cousin as the buyer of the Chatsworth Residence, under Question 13 of the Initial SOFA and First Amended SOFA, are false oaths. Defendant asserts that this omission was a mistake and oversight.

(iii) Plaintiff asserts that Defendant's failure to disclose cash gifts occurring within two years of the Petition Date, to nine different individuals, all of whom are related to Defendant, under Question 13 of the Initial SOFA and First Amended SOFA, are false oaths. Defendant asserts that this omission was a mistake and oversight.

(iv) Plaintiff asserts that Defendant's failure to disclose that she lived at the Chatsworth Residence, under Question 2 of the Initial SOFA, First Amended SOFA, and Second Amended SOFA, are false oaths. Defendant asserts that this omission was a mistake and oversight.

In general, the objective of Chapter 7 of the Bankruptcy Code is to provide individual debtors with a "fresh start," a principle central to § 727's discharge provisions. *In re Ichinose*, 946 F.2d 1169, 1172 (5th Cir. 1991). The discharge provisions mandate that the bankruptcy court grant the debtor a discharge of all debts, except in cases of very specific and serious violations by the debtor. *Id.*

Consistent with this general approach, it is Plaintiff who has the burden of proving an objection to discharge under § 727(a)(4)(A). *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992). "The elements of an objection to discharge under § 727(a)(4)(A) must be proven by a preponderance of the evidence." *Id.* Those elements are: "'(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (quoting *Beaubouef*, 966 F.2d at 178). "An omission of an asset can constitute a false oath." *Id.*

Notably, "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *Interfirst Bank Greenville, N.A., v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr. N.D. Tex. 1986). Innocent mistakes and inadvertence are generally not sufficient to result in denial of a discharge. *See e.g., Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54, 65 (Bankr. E.D. Tex. 1996) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence. Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors.").

Nevertheless, a debtor need not have acted deliberately to deceive. *Beaubouef*, 966 F.2d at 178 ("It makes no difference that [the debtor] does not intend to injure his creditors when he

makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.") (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984). The requisite intent can be shown by establishing that the debtor acted with reckless disregard for the truth, which can be proven by circumstantial evidence. *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001) ("[S]tatements [made] with fraudulent intent—or reckless indifference to the truth . . . can be proven by circumstantial evidence."); *Beaubouef*, 966 F.2d at 178 ("[T]he existence of more than one falsehood, together with [the debtor's] . . . failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive."); *FDIC v. Sullivan (In re Sullivan)*, 204 B.R. 919, 942–43 (Bankr. N.D. Tex. 1997) ("A series of even innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard for the truth.").

Plaintiff identifies four of Defendant's responses in her Initial and two amended SOFA that it claims are either false or so incomplete that they constitute a false oath and, when those four items are taken together, warrant denial of her discharge. There is no dispute that each of these responses are statements made under oath. *Beaubouef*, 966 F.2d at 178 ("It is undisputed that the schedules filed by [the debtor] constitute statements under oath within the meaning of § 727(a)(4)(A). Bankruptcy Rule 1008 requires that '[a]ll petitions, lists, schedules, statements of financial affairs, [etc.] shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746.'") (citing 4 COLLIER ON BANKRUPTCY ¶ 727.04[1], at 727–59 (15th ed. 1992). The Court will discuss whether Plaintiff has satisfied its burden of establishing the other elements of a 727(a)(4)(A) action.

Plaintiff cites to the following omissions as a basis for the denial of discharge under § 727(a)(4). First, Plaintiff asserts that Defendant failed to disclose the sale of the Chatsworth Residence in her Initial SOFA. Second, Plaintiff points to Defendant's omission of her cousin as the buyer of the Chatsworth Residence in both the Initial SOFA and First Amended SOFA. Third, in Defendant's Initial SOFA and First Amended SOFA, Defendant failed to disclose cash gifts occurring within two years of the Petition Date to nine different family members. Fourth, Plaintiff asserts that Defendant failed to disclose that she lived at the Chatsworth Residence in the Initial SOFA, First Amended SOFA, and Second Amended SOFA.

The Court has recounted the number of § 341 meetings and amendments to Defendant's SOFA. Although Defendant maintains that the omissions on her initial and amended statements were unintentional and corrected upon Plaintiff or the Chapter 7 Trustee identifying the omissions, the Court finds the cumulative number of omissions concerning. Moreover, the SOFA has specific questions that direct debtors to disclose items, such as transfers to family members. Defendant was given multiple opportunities to provide complete and accurate answers to these questions, and Defendant did this only at Plaintiff's insistence. The Court does not find Defendant's explanations credible that she simply forgot or did not understand her obligation to disclose. At best, Defendant exhibited a reckless disregard for the truth.

As mentioned, a debtor's fraudulent intent may be established through actual evidence of intent to defraud, or through the cumulative effect of many falsehoods in a debtor's schedules as evidence of a reckless disregard for the truth. *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366–67 (Bankr. N.D. Tex. 2010) (citing *Sholdra*, 249 F.3d at 383). Nevertheless, the denial of a discharge—the "death penalty" sanction of bankruptcy—must not be undertaken lightly. *Crumley*, 428 B.R. at 367 (citing *Washington 1993, Inc. v. Hudson (In re Hudson)*, 420

19

B.R. 73, 100 (Bankr. N.D.N.Y. 2009). Unquestionably, a debtor's paramount duty is to carefully consider all questions posed on the petition, schedules, and statements, and to verify the information listed is correct. *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593–94 (Bankr. N.D. Tex. 1991). Nevertheless, "[i]t may be close to impossible to produce Schedules and SOFAs that contain no mistaken information." *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767–68 (Bankr. N.D. Tex. 2005). In other cases, such as *Crumley*, reckless disregard for the truth was found where the debtor prepared his SOFA using "gest guesstimate" figures, and "never attempted to reconcile all of his sources of income prior to trial." *Crumley*, 428 B.R. at 367 (denying discharge to the husband under § 727(a)(4)(A) for reckless disregard).

Here, Defendant could have and should have exercised a similar level of diligence and care in examining and filling out her initial and amended statements. At trial, Defendant was questioned about the accuracy of her response to SOFA Question 13, which pertains to gifts made within two years before filing for bankruptcy that are valued at more than $600 (ECF No. 36 at 78). Defendant testified several times that she did not give gifts valued at more than $600 within two years prior to filing for bankruptcy (ECF No. 37 at 78–79).

That said, the questions on the SOFA require complete and full disclosure of: 1) the sale of real property within two years before filing bankruptcy; 2) the person who received the transfer of real property and the debtor's relationship to that person; 3) any gifts that were made within two years of filing bankruptcy valuing more than $600; and 4) places a debtor has lived within three years of filing bankruptcy, to name a few. Defendant later testified that she has a high school education, she now understands that her response was incorrect, and that she did not believe her giving approximately $18,000 to nine family members constituted "gifts." (ECF No. 36 at 141–42; Def. Trial Ex. C at 6–8). The Court does not find this testimony credible. While the Court does

not find these actions constitute actual fraudulent intent, at a minimum Defendant's repeated actions—or lack thereof—display a reckless disregard for the truth.

Accordingly, the Court finds Defendants violated 11 U.S.C. § 727(a)(4)(A) by making false oaths, statements, or omissions regarding: 1) the sale of the Chatsworth Residence; 2) the buyer of the Chatsworth Residence; 3) the cash gifts distributed to family members; and 4) whether Defendant resided at the Chatsworth Residence. The number of omissions in response to direct questions on the initial and amended statements demonstrates a reckless disregard for the truth. Therefore, Defendant's discharge is denied under § 727(a)(4)(A).

## II.     Claim Under § 523(a)(2)

A debt may be declared nondischargeable under § 523(a)(2) if it is a debt "for money . . . or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Plaintiff contends that Defendant owes a debt to Plaintiff for lost profits and damages caused by the suspension of the Swine Facility project, which was due to Defendant's false pretenses, false representations, or actual fraud.

The Fifth Circuit distinguishes false pretenses and false representations from "actual fraud" for purposes of § 523(a)(2)(A). False pretenses and false representations require that the creditor prove (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, and (iii) that was justifiably relied upon by the creditor. ***RecoverEdge L.P. v. Pentecost***, 44 F.3d 1284, 1293 (5th Cir. 1995). A debtor's representation related to a future action does not satisfy § 523(a)(2)(A) for a false pretense or false representation unless, at the time the representation was made, the creditor can establish that the debtor had no intention of fulfilling the promise or representation. ***Beshears v. McCool (In re McCool)***, 2019 Bankr. LEXIS 3054, at *17, 2019 WL

4781338 (Bankr. N.D. Tex. Sept. 30, 2019) (citing *In re Allison*, 960 F.2d 481, 484 (5th Cir. 1992).

To show actual fraud, the creditor must prove that (i) the debtor made a material representation, (ii) the representation was false, (iii) when the representation was made, the debtor knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (iv) the debtor made the representation with the intent that the creditor should act upon it, (v) the creditor acted in reliance on the representation, and (vi) the creditor thereby suffered an injury.

Therefore, to establish that Defendant made a false pretense or false representation, Plaintiff must prove that (i) Defendant knowingly made a false representation; (ii) the false representation described a past or current fact; and (iii) Plaintiff justifiably relied on the representation. To satisfy the reliance element, the Supreme Court has held that the degree of reliance required under § 523(a)(2)(A) is justifiable reliance.

To establish that Defendant committed actual fraud, Plaintiff must prove that (i) Defendant made a material representation; (ii) the representation was false; (iii) when the representation was made, Defendant knew it was false or she made it recklessly without any knowledge of the truth and as a positive assertion; (iv) Defendant made the representation with the intent that Plaintiff should act upon it; (v) Plaintiff acted in reliance on the representation; and (vi) Plaintiff thereby suffered an injury.

In support of the § 523(a)(2) claim, the Joint Pretrial Order makes the following general contention against Defendant: Defendant made a misrepresentation of fact to the Department of Agriculture by stating that she resided at the Chatsworth Residence—while actually living at the

San Antonio Residence—to induce the Department of Agriculture to issue a halt on the construction of the Swine Facility.

There is ample and credible evidence to support the contention that Defendant made a false pretense or false representation to the Department of Agriculture. At trial, Defendant acknowledged that she lived at the San Antonio Residence at the time she relayed to Johnstone that she resided at the Chatsworth Residence. Yet here, Defendant made a false pretense or false representation to the Department of Agriculture, not Plaintiff. In fact, Plaintiff's evidence showed that it halted construction of the Swine Facility at the Department of Agriculture's request, not Defendant's. Therefore, Plaintiff has not met its burden to establish that Defendant made a false pretense or false representation to Plaintiff.

Similarly, Plaintiff has not provided sufficient evidence to establish that Defendant committed actual fraud. Although (i) Defendant made a material representation; (ii) the representation was false; (iii) when the representation was made, Defendant knew it was false or she made it recklessly without any knowledge of the truth and as a positive assertion; the Court cannot find that Plaintiff met its burden as to element (iv) that Defendant made a representation with the intent that Plaintiff should act upon it. This element embodies the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud. The evidence did not show that Defendant made the representation that she lived at the Chatsworth Residence with the intent that Plaintiff should act upon it. Rather, the evidence indicated that Defendant's motive was for the Department of Agriculture to act upon her representation. Indeed, Defendant did not make any statements to Plaintiff at all about her living situation, much less false statements that Plaintiffs justifiably relied upon, with that reliance

causing the debt. For these reasons, the Court finds that Defendant's actions were directed at a third party, the Department of Agriculture.

The Court understands that exceptions to discharge serve both to punish the debtor and "concomitantly to protect the *inculpable* creditor." ***McCrory v. Spigel (In re Spigel)***, 206 F.3d 27, 35 (1st Cir. 2001) (quoting ***Century 21 Balfour Real Estate***, 161 F.3d 7, 10 (1st Cir. 1994) (emphasis in original). Plaintiff is an inculpable creditor who is not protected by the outcome here. However, that protective policy must be balanced against the policy that exceptions to discharge are construed narrowly. The Court therefore finds that Plaintiff failed to meet its burden to establish that Defendant (i) made a false pretense or false representation to Plaintiff or (ii) committed actual fraud to Plaintiff. As such, Plaintiff's claim under § 523(a)(2) is denied.

### III.    Tortious Interference Under § 523(a)(6)

Section 523(a)(6) provides that an individual debtor will not get a discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." For the act to be willful and malicious "a debtor must have acted with 'objective substantial certainty or subjective motive' to inflict injury." ***Williams v. IBEW Local 520 (In re Williams)***, 337 F.3d 504, 508–09 (5th Cir. 2003) (citing ***Miller v. J.D. Abrams Inc. (In re Miller)***, 156 F.3d 598, 603 (5th Cir. 1998). Whether the acts were substantially certain to cause injury (the "objective test") is based on "whether the Defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the Plaintiff." ***Mann Bracken, LLP v. Powers (In re Powers)***, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009) (emphasis in original). A subjective motive to cause harm (the "subjective test") exists when a tortfeasor acts "deliberately and intentionally, in knowing disregard of the rights of another." *See **Miller***, 156 F.3d at 605–06.

The Supreme Court has determined that the word "willful" under § 523(a)(6) modifies the word "injury," indicating that a finding of nondischargeability requires a deliberate or intentional injury, not merely a deliberate act that results in injury. *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998). In defining the term "malicious" under § 523(a)(6), the Fifth Circuit holds that it means "implied malice," as opposed to "special malice." *Miller*, 156 F.3d at 605. "Implied malice" means "acts done with the actual intent to cause injury," whereas "special malice" requires a showing of a motive to harm. *Id.* The Fifth Circuit, in recognizing that the definition of implied malice is the same standard used by the Supreme Court for "willful injury," held that a finding of implied malice can render a debt nondischargeable under § 523(a)(6). *Id.* (discussing *Kawaauhua*, 523 U.S. at 57).

The Court first notes that although "tortious interference with contract" is an intentional tort, it is not dispositive of the Court's § 523(a)(6) analysis. *See Williams*, 337 F.3d at 509 ("Despite similarities in the language used to describe an injury under Section 523(a)(6) and intentional torts, Section 523(a)(6) creates a narrower category of tortious conduct."). Indeed, courts have noted that "[m]erely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful." *Miller*, 156 F.3d at 604. Similarly, courts have declined to find that the wrongfulness of those intentional acts itself established the "injury" required by § 523(a)(6). *Id.*

This Court also declines to find the requisite "injury" on the sole basis of an alleged tortious act, instead asking whether there was either an objective substantial certainty of harm or a subjective motive to cause harm that established a "willful and malicious injury." *Guerra & Moore Ltd, LLP v. Cantu (In re Cantu)*, 389 F. App'x 342, 345 (5th Cir. 2010)*; see Rain Bird Corp v. Milton (In re Milton)*, 355 B.R. 575, 581–82 (Bankr. N.D. Miss. 2006) (relying on findings that

debtor's actions were "willful, intentional, and malicious" and "calculated to cause damage to [creditor's] business" when assessing whether tortious interference with a contract under Mississippi law established a "willful and malicious injury").

The Court finds that Defendant's alleged tortious "interference" with Plaintiff's contract is not, by itself, a sufficient "injury" for purposes of the § 523(a)(6) analysis. Instead, this Court must determine whether Plaintiff has shown that Defendant's alleged tortious interference with its contracts entailed either an objective substantial certainty of harm or a subjective motive to cause harm.

### A. Objective Substantial Certainty of Harm

The Court first considers whether Defendant's acts were substantially certain to result in injury to Plaintiff. Under Texas law, "A party alleging tortious interference must prove four elements to sustain its claim: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *ACS Inv'rs v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). "Intentional interference does not require intent to injure, only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Midway Collections, Inc. v. Graff (In re Graff)*, 475 B.R. 770 (Bankr. E.D. Tex. 2012) (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (quotation marks omitted).

Here, Defendant's conduct was not willful and malicious under the objective test. At trial, Plaintiff argued that Defendant knew about the existence of Plaintiff's contracts, yet misrepresented where she was currently living to purposefully delay the Swine Facility's construction and interfere with Plaintiff's contracts (ECF No. 37 at 67). Plaintiff failed to

26

demonstrate how Defendant knew about Plaintiff's contractual relationships. The evidence at trial did not establish that Defendant specifically intended to harm Plaintiff, nor did Plaintiff provide evidence that Defendant committed deliberate acts resulting in Plaintiff's injury. Defendant testified at length how she contacted Johnstone at the Department of Agriculture to obtain more information about the Swine Facility's construction (ECF No. 35 at 225). In fact, when Plaintiff asked Defendant if her purpose in writing letters to Johnstone was "to put a stop to the construction of the [Swine Facility]," Defendant answered, "No, I wanted to know what was going on. How could I put a stop to it? I don't have the authority." (ECF No. 35 at 223–25). Given the evidence presented at trial, the Court cannot infer that Defendant knew about Plaintiff's contracts with Farm Boy, Special K Hog Farm, and other business entities, much less that she intended to interfere with those existing contracts.

As for the third element of a tortious interference claim, "[t]o establish proximate cause, a [plaintiff] must show that 'the defendant took an active part in persuading a party to a contract to breach it.'" *Am. Registry of Radiologic Technologists v. Bennett*, 2013 U.S. Dist. LEXIS 120548, at *49–50, 2013 WL 4520533 (W.D. Tex. 2013) (quoting *Amigo Broad., LP v. Spanish Broad. Sys.*, 521 F.3d 472, 493 (5th Cir. 2008); *see also* *Reg'l Specialty Clinic, P.A. v. S.A. Randle & Assocs., P.C.*, 625 S.W.3d 895, 902 (Tex. App.—Houston [14th Dist.] 2021, no pet.) ("To establish the element of a willful and intentional act of interference, a plaintiff must produce some evidence that the defendant . . . knowingly induced one of the contracting parties to breach its obligations under a contract.") (citing *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Here, there is no evidence indicating that Defendant actively persuaded Farm Boy, Special K Hog Farm, and other business entities, to breach their contractual relations with Plaintiff. Accordingly, Plaintiff has not shown that Defendant, by relaying to the Department

of Agriculture that she was opposed to the Swine Facility's construction, proximately caused Plaintiff's exemplary damages.[13] Based on Plaintiff's evidence, it is nearly impossible to determine whether Plaintiff's damages were "substantially certain" to occur. As such, Plaintiff has failed to demonstrate how Defendant's acts were substantially certain to result in injury to Plaintiff for purposes of the § 523(a)(6) analysis.

Even if this Court determined that Plaintiff's injury was proximately caused by Defendant's acts (i.e., Defendant's call to the Department of Agriculture seeking information regarding the Swine Facility's construction and mentioning that she was "very opposed" to its construction), this would constitute a less demanding standard than "substantial certainty." Accordingly, Plaintiff has failed to produce evidence that Defendant's conduct met the objective prong of the "willful and malicious injury" inquiry.

### B. Subjective Motive to Cause Harm

Under the subjective test, Plaintiff must show that Defendant acted deliberately and intentionally with knowing disregard of Plaintiff's rights. The Court finds that Plaintiff has similarly not established that Defendant had the subjective motive to cause harm. It remains unclear to the Court how Defendant acted with "malice," such that Defendant had a specific intent to cause substantial injury to Plaintiff. Therefore, Plaintiff has not established that Defendant acted with the substantial motive to cause harm. Plaintiff has also not proven by a preponderance of the evidence that Defendant's conduct met the subjective standard. Accordingly, given that the record established neither the "objective" nor the "subjective" prong of the "willful and malicious injury"

---

[13] "Intent to injure indicates actual malice, a state of mind that must be shown to recover *exemplary damages*. Actual malice or intent to injure is not a required element where a plaintiff seeks compensatory damages for tortious interference . . . ." *Sw. Bell Tel. Co.*, 813 S.W.2d at 619 (Tex. App.—Houston [14th Dist.] 1991) (citing Restatement (Second) of Torts § 8A (1965)), rev'd on other grounds, 843 S.W.2d 470 (Tex. 1992) (emphasis added). Even if the Court found that Defendant's conduct resulted in Plaintiff's injury, Plaintiff would not be entitled to exemplary damages under the state law standard.

inquiry, Plaintiff has not proven that its tortious interference with contract claim against Defendant should be excepted from discharge under § 523(a)(6).

## CONCLUSION

For the reasons stated herein, Plaintiff's Complaint pursuant to 11 U.S.C. §§ 523 and 727 is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's Complaint pursuant to 11 U.S.C. § 727(a)(4) is GRANTED. Plaintiff's Complaint pursuant to 11 U.S.C. § 523(a)(2) and (a)(6) is DENIED. Therefore, Defendant's discharge pursuant to 11 U.S.C. § 727(a)(4) is hereby DENIED. Pursuant to Fed. R. Civ. P. 54, Fed. R. Bank. P. 7054, and Local Rule 7054, Plaintiff may make an application for attorney's fees. All other relief is DENIED.

Plaintiff is ORDERED to prepare a form of Judgment consistent with this Memorandum Opinion and submit the proposed Judgment within seven (7) days from entry of this Memorandum Opinion.

# # #